*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0146p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EXACT SOFTWARE NORTH AMERICA, INC.,
f/k/a Macola, Inc.,

*Plaintiff*,

No. 12-3538

INFOCON SYSTEMS, INC.,

*Defendant-Appellant*,

*v.*

J. FOX DEMOISEY,

*Intervenor-Appellee*.

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:03-cv-07183—James G. Carr, District Judge.

Argued: April 24, 2013

Decided and Filed: May 23, 2013

Before: GILMAN, ROGERS and SUTTON, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Kevin C. Burke, Louisville, Kentucky, for Appellant. Thomas E. Clay, THOMAS E. CLAY, P.S.C., Louisville, Kentucky, for Appellee. **ON BRIEF:** Kevin C. Burke, Louisville, Kentucky, Peter Ostermiller, Louisville, Kentucky, for Appellant. Thomas E. Clay, THOMAS E. CLAY, P.S.C., Louisville, Kentucky, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. This software-licensing dispute became more intriguing after the parties settled it. On the eve of settlement, Infocon, a software distributor, fired its lawyer, J. Fox DeMoisey. Hoping to ensure that he got paid for his

work, DeMoisey placed a charging lien on the settlement proceeds. Exact delivered the $4 million settlement to the district court, which distributed most of it to Infocon and placed the remaining $1.2 million in escrow pending resolution of the fee dispute. Nine months later, Infocon sued DeMoisey in Kentucky state court for malpractice. After that case ended with a summary judgment ruling in favor of the lawyer, the district court took on the fee dispute, held a bench trial and awarded DeMoisey $1.4 million in quantum meruit relief. Infocon complains that this was too much, that it had a right to a jury trial over the issue and, for the first time on appeal, that the district court lacked jurisdiction over the fee dispute because DeMoisey and Infocon both hail from Kentucky. We affirm.

I.

Since 1971, Exact, using this corporate name and one other, has developed software for small and mid-sized businesses. Infocon began distributing Exact's software in 1998. When Exact upgraded its software, Infocon also made money selling, installing and training users on the upgrades. A foreign company entered into talks to acquire Exact, and it suggested to distributors like Infocon that it would continue providing new versions of the software. But Exact abandoned its next upgrade, leaving distributors like Infocon out to dry.

Exact sued Infocon in Ohio state court in 2003. To hear Exact tell it, Infocon owed unpaid software maintenance fees it had collected from its customers and was supposed to pass on to Exact. Infocon stopped making those payments in December 2002, and they totaled $143,031.77.

To hear Infocon tell it, the company stopped making the payments because Exact misled Infocon about the plans to develop new upgrades. As a result, Infocon claimed, it had no obligation to turn over maintenance fees, indeed had already turned over more maintenance fees than it should have, and it had incurred a host of other expenses. Infocon removed the case to federal court on the basis of diversity jurisdiction, 28 U.S.C. § 1332, and filed counterclaims there. Exact is an Ohio corporation, and Infocon is a Kentucky corporation. At that point, DeMoisey and his law firm represented Infocon.

Before long, the case entered an intractable phase of discovery. Exact, says the district court, showed "persistent noncompliance with" the court's "ever more stringent" discovery orders. R.397 at 2. Those orders came to a head in August 2006, when the district court threatened Exact that it might allow Infocon to seek a default judgment. Exact continued to drag its feet, and Infocon moved for a default judgment. At that point, Exact apparently got the message: It fired its lawyer, hired new counsel and asked the court to hold off on ruling on the motion.

The parties entered settlement negotiations. Infocon's two owners, Robert Hughes and Deepak Nijhawan, and DeMoisey mediated the case with Exact. At a meeting on February 28, 2007, Hughes and an Exact representative agreed on a $4 million figure. DeMoisey urged Infocon to hold out for more—at least $5.3 million—apparently so that he, Hughes and Nijhawan could receive equal $1 million shares (after taxes).

Hughes and Nijhawan saw things differently and worried that DeMoisey was getting greedy. According to them, DeMoisey started demanding 50 percent of any settlement (a premium on an oral 33-percent contingency fee arrangement), which would include bonuses for his co-counsel. Hughes and Nijhawan were concerned that Exact might bring another lawsuit, that it might pull its $4 million offer and that DeMoisey was pushing too hard. That left the clients and their lawyer, in the words of the district court (and Strother Martin), with a "failure to communicate." R.397 at 6.

Hughes and Nijhawan hired new counsel, Peter Ostermiller. They formalized the settlement with Exact on March 12, and two days later told DeMoisey about the settlement. The district court ordered the parties to file a notice of dismissal by August 31. The order said: "any dispute re. terms of settlement to be submitted to the [Court] for final adjudication." R.207. On August 12, Infocon fired DeMoisey, who filed a motion for leave to withdraw on August 13. That same day, DeMoisey filed a "Notice of Charging Lien," "hereby notify[ing] the Court and parties of the existence of an equitable charging lien in favor of himself and his law office for unpaid services, attaching to the settlement proceeds payable by Exact Software to Infocon Systems,

Inc." R.211. After a status conference, the district court postponed the deadline for the parties to file a stipulated dismissal. That order said that the "court [was] to retain jurisdiction re. charging lien." R.214. The court ordered Exact and Infocon to pay the settlement proceeds into a court registry and transferred $2.5 million to Infocon and $200,000 to DeMoisey, leaving the balance subject to the fates of further litigation. Exact filed a joint stipulation of dismissal, and on September 21 the district court signed the stipulation under the heading "It is so ordered." R.233.

DeMoisey and Infocon engaged in discovery over the fee dispute, after which they filed motions for summary judgment with the district court. On May 29, 2008, Infocon took things one step further and filed a legal malpractice action against DeMoisey in Kentucky state court. Concerned about the risk of claim preclusion, DeMoisey filed counterclaims for attorney's fees in the state action. He explained this to the district court in December and withdrew a number of his claims from the federal court—all of them in fact except his claim based on quantum meruit. Due to the state court action, DeMoisey asked the district court to "remand and reschedule the hearing now set for January 20, 2009" on his fee request. R.311. He "proposed that [the] Court continue to supervise the overall settlement or resolution of the pending Charging Lien matter," *id.* at 2, and "preserve[]" the "status quo . . . until all matters pending in the [state court] have been resolved," *id.* at 7. The district court "vacated and continued" its trial date. R.332.

The state court granted summary judgment against Infocon based on the expiration of the statute of limitations. As for DeMoisey's counterclaims, the court ruled as a matter of law against him on all but the quantum meruit claim because there was never an enforceable contingency fee agreement. Before the state court could go to trial on the quantum meruit question, DeMoisey "moved to transfer the case back to" the federal district court, and the state court granted the motion. R.348-1. DeMoisey claimed that, in view of the state court's ruling, the district court "should now make its determination as to [the] *quantum meruit* value of [his] services." R.348. In December 2011, the court presided over a three-day bench trial, at the end of which it awarded

DeMoisey $1.4 million (inclusive of the $200,000 he received in 2007). Infocon appealed the fee award, and DeMoisey intervened on appeal to protect the award.

## II.

We start as we must with jurisdiction. And we ignore as we must Infocon's failure to preserve the issue until it had lost in the district court. The jurisdiction of the federal courts is set by the Constitution and Congress, and may not be created by the consent (or forfeiture) of the parties, requiring us to police jurisdiction for ourselves, whether Infocon deserves the inquiry or not. Two potential jurisdictional defects exist.

## A.

The first arises from the parties' stipulation of dismissal. It "stipulate[s] and give[s] notice that the within action and all claims and counterclaims therein are dismissed with prejudice, each party to bear its own costs." R.225. The parties submitted the order under Civil Rule 41(a)(1)(A)(ii), which permits a plaintiff to "dismiss an action without a court order by filing . . . a stipulation of dismissal signed by all parties who have appeared" and to do so with prejudice if the parties say so, as they did here. At first glance, this order looks like the kind of unconditional, with prejudice, final resolution of a case that precludes later involvement of the federal court. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).

In *Kokkonen*, after the parties settled their dispute, they filed a "Stipulation and Order of Dismissal with Prejudice" and also did so under Civil Rule 41(a)(1)(A)(ii). *Id.* at 377–78. The settlement agreement required one party to return some files, which it never did. The other party asked the district court for help, and the court ordered compliance with the settlement agreement. The Supreme Court held that the district court lost any authority to do so when the parties unconditionally dismissed the case. A court has "power to protect its proceedings and vindicate its authority" by investigating a potential "violation of a court's order." *Id.* at 380. But backing out of an agreement is not the same thing as violating a court order. Had the stipulation contained a "separate provision" that retained the district court's jurisdiction over the

settlement or had the district court "incorporat[ed] the terms of the settlement agreement" in an order, "ancillary jurisdiction to enforce the agreement would . . . exist." *Id.* at 381. That way, "[i]f the parties *wish* to provide for the court's enforcement of a dismissal-producing settlement agreement, they can seek to do so. . . . Absent such action, however, enforcement . . . is for state courts, unless there is some independent basis for federal jurisdiction." *Id.* at 381–82. No such limitation existed in *Kokkonen*. In the absence of any provisions or orders retaining jurisdiction, the Court concluded that the case was over, leaving the district court no authority to enforce the settlement.

Although today's case raises a *Kokkonen* issue, it does not raise a *Kokkonen* jurisdictional defect. Read in context, the parties' stipulation of dismissal did not eliminate the court's authority to resolve the fee dispute between Infocon and DeMoisey. The stipulation does not appear alone. It is preceded by two recent orders that expressly reserved jurisdiction over the fee dispute and that were entered after the parties had settled the underlying case. The July 31 order said: "any dispute re. terms of settlement to be submitted to the [Court] for final adjudication." R.207. And the August 27 order, which directed the parties to file a joint stipulation of dismissal, was more explicit: "court to retain jurisdiction re. charging lien." R.214. All that the September 14 order did was end the underlying dispute between Exact and Infocon. But, as contemplated, it permitted Infocon and DeMoisey to return to court to determine the amount of money protected by the charging lien. The September 14 order says nothing about that dispute, and in view of the two prior orders the most reasonable interpretation of the last order is that it did not divest the court of its expressly reserved jurisdiction to resolve the fee dispute while allowing Exact to move on. Taken together, the three orders give a "reasonable indication" that the district court would take care of the attorney's lien dispute. *Re/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 643 (6th Cir. 2001).

Keep in mind that Civil Rule 41(a)(1)(A)(ii) orders, generally speaking, are "self-executing" and do "not require judicial approval." *Green v. Nevers*, 111 F.3d 1295, 1301 (6th Cir. 1997). It thus is not even clear that the court could have conditioned entry of the order on reservation of jurisdiction over the fee dispute, and in view of *Kokkonen*

it could not have preserved jurisdiction over the fee dispute by entering an order to that effect after the parties had submitted the stipulated dismissal. That left two unobjectionable options, one controlled by the court, one controlled by the parties. The court could reserve jurisdiction over the fee dispute before the Rule 41 submission with the parties' consent, which it did and which the parties agreed it would do at a status conference. *See* R.214, R.227 at 8–12. And the parties could have added suspenders to this belt with comparable language in the stipulation of dismissal, which they did not do. But neither *Kokkonen* nor Rule 41 required them to echo the court's reservation of jurisdiction with a reservation of their own, so long as the Rule 41 order is fairly read not to divest jurisdiction over the charging lien dispute. It is.

One other thing supports this interpretation of the orders, both from the perspective of the court and the parties. A contrary view would require us to assume that the parties, DeMoisey and the court agreed to place $1.2 million in escrow in the court's registry, all while leaving the court without existing power to disburse it or the parties and DeMoisey without existing authority to get it back. Nothing in the record indicates that this is what the parties, DeMoisey or the court had in mind. Far better, we think, to read the stipulation's silence about the fee dispute as consistent with the prior two reservations of jurisdiction to resolve the dispute and as consistent with the court's ongoing jurisdiction over, indeed possession of, the res. All of this led counsel for Infocon to concede at oral argument that no *Kokkonen* defect exists, and for the reasons just stated we independently agree.

B.

The second potential jurisdictional defect stems from the reality that this fee dispute, like most fee disputes, concerns non-diverse parties—Infocon, a Kentucky corporation, and its lawyer, DeMoisey, a Kentucky resident. A few basics of diversity jurisdiction offer a starting point.

Federal courts have "original jurisdiction of all civil actions . . . between citizens of different States" when the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(1). "[C]omplete diversity between all plaintiffs and all defendants" is

required; no plaintiff can be the citizen of the same State as any defendant. *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005).

A federal court has "supplemental jurisdiction" over related claims that arise from the same core of operative facts that prompted the lawsuit over which the court has original jurisdiction. Thus:

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). So long as a court has original jurisdiction over a civil action, § 1367(a) provides a "broad grant of supplemental jurisdiction over other [related] claims." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558–59 (2005).

Subsection 1367(b) cuts back on some of the supplemental jurisdiction that subsection (a) creates:

> In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

28 U.S.C. § 1367(b). In a diversity action, district courts thus may not hear supplemental claims when doing so would be "inconsistent" with § 1332.

How do these principles apply here? This action started as a § 1332 diversity case, and complete diversity existed over the underlying dispute. The fee dispute arose out of, and was thus related to, the underlying action, making it eligible for supplemental jurisdiction under § 1367(a), which is what our case law seems to say and what the lawyer and client here assume. *See Kalyawongsa v. Moffett*, 105 F.3d 283, 287–88 (6th

Cir. 1997). (More on this point below.) The rub under this framing of the issue is whether the fee dispute between Infocon and DeMoisey, both Kentucky residents, runs into the § 1367(b) bar.

We think it does not for three reasons. *First*, the words of § 1367(b) themselves suggest that the carve-out does not apply. When it comes to new plaintiffs, the subsection blocks supplemental jurisdiction "over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules." DeMoisey neither joined the case as a plaintiff under Rule 19 nor intervened as a plaintiff under Rule 24. To the contrary, his efforts after the settlement amounted to an exit strategy—filing a motion to withdraw as counsel, and filing a charging lien over the settlement proceeds to make sure he got paid for his prior work when he left the case. Not once did he mention Rule 24, and the district court never treated him as an intervening party. Efforts to receive a contingency fee earned in a case do not necessarily require a lawyer to sue a client; they usually require the attorney only to ask the court to allocate some of the settlement/judgment to the lawyer. That is all DeMoisey did. By its terms, the statutory limitation does not apply.

*Second*, there is a good reason why Congress would not apply § 1367(b) to run-of-the-mine fee disputes between a party and its (usually in-state) lawyer over the distribution of settlement proceeds. For years, indeed since the early years of the republic, federal courts have resolved fee disputes between lawyers and their clients when those disputes arise out of the underlying case, whether by conditioning the withdrawal of a lawyer on the fair payment of the lawyer's fees or by conditioning the final distribution of settlement proceeds or judgments on the fair payment of the lawyer's fees. *See, e.g.*, *Sloo v. Law*, 22 F. Cas. 365, 366 (C.C.S.D.N.Y. 1859) (No. 12,958) ("The court will consent that a solicitor be substituted in the place of Mr. Sargeant, when his fees are paid, and not before."); *Woodbury v. Andrew Jergens Co.*, 69 F.2d 49, 51 (2d Cir. 1934) (L. Hand, J.); *see also Doggett v. Deauville Corp.*, 148 F.2d 881, 883 (5th Cir. 1945) (collecting cases and observing that "[i]n the federal courts the power of the court to fix a fee has often been asserted"); *cf. Hoffman v. McClelland*, 264 U.S. 552, 558

(1924) ("[W]here in the progress of a suit in a federal court property has been drawn into the court's custody and control, third persons claiming interests in or liens upon the property may be permitted to come into that court for the purpose of setting up, protecting and enforcing their claims.").

More recently and more locally, *Kalyawongsa v. Moffett* illustrates the practice and offers an explanation for it. In holding that a lawyer-client fee dispute was part of the same case or controversy as the original lawsuit and came within § 1367(a)'s grant of supplemental jurisdiction, we explained: "Lawyers are officers of the court. Their fees are part of the overall costs of the underlying litigation. Resolution of related fee disputes is often required to provide a full and fair resolution of the litigation." 105 F.3d 283, 287–88 (6th Cir. 1997). In reaching this conclusion, *Kalyawongsa* relied on several cases that came to a similar conclusion. *See Curry v. Del Priore*, 941 F.2d 730, 731–32 (9th Cir. 1991) (stating that the practice allows a court to "render an efficacious judgment," to "control the litigation before it" and "to regulate members of its own bar"); *Jenkins v. Weinshienk*, 670 F.2d 915, 918 (10th Cir. 1982) (stating that a court retains power to "decide collateral matters necessary to render complete justice"); *Novinger v. E.I. DuPont de Nemours & Co.*, 809 F.2d 212, 217 (3d Cir. 1987) (stressing the "ability of the court to dispose of cases before it in a fair manner"); *see also, e.g.*, *Nat'l Equip. Rental, Ltd. v. Mercury Typesetting Co.*, 323 F.2d 784, 786 n.1 (2d Cir. 1963) ("The termination of relations between a party in litigation in a federal court and his attorney is a matter relating to the protection of the court's own officers."); *Marino v. Pioneer Edsel Sales, Inc.*, 349 F.3d 746, 753 (4th Cir. 2003) (arguing that "preventing" a district court "from deciding whether [a lawyer] is entitled to attorney's fees for work she allegedly performed in connection with [a lawsuit] would thwart [the court's] ability to manage" the case).

*Third*, we do not lightly presume that Congress would alter such an established practice. We know of no case before Congress added § 1367(b) in 1990 in which a court held that a district court could not determine a contingency fee owed to an attorney for his or her work on the case, whether at the end of the litigation or at the time the attorney

asked to withdraw from the case. In this area, the legislature thus did "not write upon a clean state, [and i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (citations and quotation marks omitted).

Congress did no such thing. Section 1367 does not speak to fee disputes, and nothing in the statute suggests that Congress meant otherwise. It refers to supplemental jurisdiction over "claims" that would be "inconsistent" with the requirements of § 1332 as understood at that time. No pre-1990 case was inconsistent with what the district court did here. And the amendment does not speak with the kind of clarity needed to end this practice. *See* Karen Nelson Moore, *The Supplemental Jurisdiction Statute: An Important But Controversial Supplement to Federal Jurisdiction*, 41 Emory L.J. 31, 51 (1992) (noting the ambiguity of the "inconsistent with" clause); 13D Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, Federal Practice and Procedure § 3567.2 (3d ed. 2008) (calling the "inconsistent with" clause "curious" and noting that "its effect on the more specific terms of § 1367(b)—those referring to claims under specific rules—is far from clear").

Instead of ending the traditional authority of district courts over the lawyers in front of them for better (payment of their fees) or for worse (contempt), the statute pursued two other ends. It overruled *Finley v. United States*, 490 U.S. 545 (1989), by allowing courts to continue exercising jurisdiction in federal question cases over pendent state law claims, *see Exxon Mobil Corp.*, 545 U.S. at 558; and it prevented plaintiffs from "evad[ing]" the complete-diversity requirement by filing a lawsuit against diverse defendants and promptly joining new non-diverse plaintiffs or defendants, *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 727 (2d Cir. 2000) (Sotomayor, J.) (quoting H.R. Rep. No. 101-734, at 29 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6860, 6875); *see Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374–75 (1978) (rejecting supplemental jurisdiction over state law claim by plaintiff against non-diverse third-party defendant because a contrary rule would allow plaintiffs to "evade[]" complete diversity).

A fee dispute like this one implicates neither of these concerns. The dispute grew out of the underlying litigation. It did not exist, and by its nature could not have existed, at the time the lawsuit was filed. In view of the court's oversight of the settlement agreement, the court merely assumed responsibility for ensuring that the settlement proceeds were distributed fairly to all of the relevant parties and lawyers, a job well suited to the judge who oversaw the underlying litigation. Once Infocon fired DeMoisey and once he asked to withdraw from the case, the court had two options: (1) condition his withdrawal on full payment or (2) condition the distribution of the settlement proceeds on resolution of the appropriate fee owed to him. Both approaches traditionally have been available to a judge who has presided over the litigation without requiring the lawyer to "intervene" as a plaintiff in the case, and more to the point the language of § 1367(b) does not remove either option from the district court's traditional authority over the parties and lawyers before it.

None of this means that district courts asked to determine a contingency fee or appropriate attorney's fees have authority to resolve every freestanding claim or defense that arises from a fee dispute. *See Wolfe v. Lewis*, 60 U.S. 280, 283 (1857). But that is not what Infocon and DeMoisey tried to do. They litigated their legal malpractice and contract claims in state court. In contrast to a legal malpractice claim, a request for quantum meruit relief merely offered a way of calculating the compensable work DeMoisey did for his client. It did not require the district court to resolve legal malpractice claims, where a strong case can be made that the district court would have lacked any such authority. *See Elusta v. City of Chicago*, 696 F.3d 690, 694 (7th Cir. 2012) ("Attorney's fee disputes are closely enough related to the underlying litigation to be the basis for supplemental jurisdiction, even if other attorney-client disputes, such as malpractice actions, are not."). We need not resolve the point. For now, it suffices to say that a fees-for-services claim does not automatically exceed the district court's jurisdiction when the lawyer and client come from the same State.

This last point suggests another way of looking at this dispute, one not joined by the parties and one in some tension with our decision in *Kalyawongsa v. Moffett*. The

premise of supplemental jurisdiction authorized by § 1367(a) and curbed by § 1367(b) is that a new "claim" has been added to the case. Yet a district court's traditional authority to ensure that lawyers do not leave their clients in the lurch (by leaving the case without permission from the court) or to ensure that the clients do not leave their lawyers in the lurch (by failing to pay them) does not turn on new claims filed by lawyers against clients or new claims filed by clients against lawyers. No intervention is required for a lawyer to ask a district court to ensure that he be paid for his work. And no complaint or claim need be filed against the client to ensure this happens. A motion by the lawyer in the case and/or a charging lien will suffice. When all that the lawyer seeks is payment for services performed, payment of a contingency fee or payment from a common fund, all in a pending case, there is no reason to intervene, to file a new claim or even to become a "party" to the case—leaving the resolution of this issue not to the intricacies of § 1367 but to the traditional authority of a district court over the parties and lawyers before it. Save at most until the parties ask the district court to resolve a legal malpractice claim, in other words, § 1367 has nothing to do with it. Whether under this way of looking at the case or under § 1367, the district court had authority to ensure that DeMoisey was paid for his work in this case.

Infocon insists that *Griffin v. Lee*, 621 F.3d 380 (5th Cir. 2010) (per curiam), requires a different outcome. Griffin was the beneficiary of a trust, and he sued the trustees for fraud and reformation in Louisiana state court. The trustees removed the case to federal court based on diversity jurisdiction, as Griffin hailed from Mississippi, and the trustees hailed from Delaware, New York, Ohio and Louisiana. On the same day that the district court granted summary judgment against Griffin, his lawyer, Lee, filed a motion to intervene as a party under Civil Rule 24. Lee asked for unpaid fees from Griffin, which he asked to be paid from the trust. The court awarded him over $16,000 and ordered the trustees to give him a cut on future payments to Griffin. But Lee, like one of the trustees, was from Louisiana, and according to the Fifth Circuit the lack of complete diversity deprived the court of supplemental jurisdiction over his claim under § 1367(b). *Id.* at 390.

Whether the Fifth Circuit correctly applied § 1367(b) to the facts before it need not detain us. DeMoisey, unlike Lee, never intervened in the action in the district court. He instead took the orthodox approach of filing a lien on the proceeds *before* the case was dismissed. And the district court took the orthodox approach of conditioning the final distribution of the settlement proceeds on DeMoisey's full payment. Whether DeMoisey's invocation of Civil Rule 24 here would have changed matters is not clear. It is not even clear, indeed, whether we would put DeMoisey on the plaintiff's side of the "v," as required to create a complete-diversity problem. If district courts for generations have resolved fee disputes between lawyers and clients that grew out of the underlying dispute, we would expect stronger signals from Congress before interpreting the provision to scrap this time-honored and eminently useful practice. Either way, DeMoisey did not take Lee's path. He took the well-marked path of filing a notice of a lien, not a motion to intervene, in an existing federal court case and of doing so before the case was dismissed. The district court properly exercised jurisdiction over this fee dispute.

## C.

One last point on jurisdiction. Infocon argues that the district court gave up authority over the claim under § 1367(c) when the case went to state court. We disagree. That subsection allows a district court to disclaim supplemental jurisdiction in certain circumstances, including when the original claims are dismissed. But the district court here did no such thing. Once Infocon filed its state court action, the district court "vacated and continued" its trial date and required the parties to submit status reports. R.332. Once the state court dismissed everything but DeMoisey's quantum meruit claim, DeMoisey asked the court to "schedule a status conference" and to prepare to "make its determination as to [the] *quantum meruit* value of Mr. DeMoisey's services." R.349. This sequence shows that the district court held the case in abeyance while the state litigation ran its course, as all of the parties seemed to assume (until one of them lost).

III.

The merits of the appeal are more straightforward.  Infocon first argues that it deserved a jury trial over the quantum meruit claim.  "In Suits at common law, where the value in controversy shall exceed twenty dollars," the Seventh Amendment says, "the right of trial by jury shall be preserved."  U.S. Const. amend. VII.  The right principally allows an individual to demand a jury when a lawsuit will resolve legal, as opposed to equitable, rights.  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

The problem for Infocon is that a lien on settlement funds implicates an equitable, not a legal, function.  Courts have long recognized that judges, not juries, have responsibility for discharging liens, including attorney's fee liens.  In *Wylie v. Coxe*, 56 U.S. 415 (1854), a lawyer helped his client recover against Mexico.  The lawyer had a contingency fee contract, but he never got paid.  The lawyer's claim for fees "constituted a lien upon the [recovery] fund," and that lien was "a sufficient ground for an equity jurisdiction."  *Id.* at 420.  *Barnes v. Alexander*, 232 U.S. 117 (1914), came to the same conclusion.  Invoking equity, the Court determined that a contingency fee agreement created a lien on the litigation proceeds.  *See also Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. 356, 363–67 (2006).  "An action to foreclose a lien . . . is equitable in nature."  9 Wright & Miller, *supra*, § 2316.  This conclusion applies equally to mortgage liens, *see, e.g.*, *Rozelle v. Conn. Gen. Life Ins. Co.*, 471 F.2d 29, 31 (10th Cir. 1972); tax liens, *see, e.g.*, *Damsky v. Zavatt*, 289 F.2d 46, 53 (2d Cir. 1961) (Friendly, J.) (stating that "[f]oreclosure of the mortgagor's equity of redemption was an established head of equity jurisdiction well before 1791," and concluding that enforcement of tax liens is "sufficiently akin to the historic equity practice to preclude successful contention for a right to jury trial"); and judgment liens, *see, e.g.*, *Perera Co. v. Goldstone*, 491 F.2d 386, 387 (9th Cir. 1974).

More recently, the Second Circuit came to this conclusion in a similar setting.  *See Rosenman & Colin v. Richard*, 850 F.2d 57 (2d Cir. 1988).  Bernice Richard and Julian Sherrier fought over the ownership of some sculptures, and the Rosenman law firm represented Richard in the litigation.  After trial, Richard refused to pay Rosenman

because she thought it had charged too much, and Rosenman placed a lien on the underlying judgment. The district court held a bench trial and awarded Rosenman fees based on its quantum meruit claim. On appeal, Richard argued that she had a right to a jury trial. Not so, the Second Circuit held: "In the context of both attorneys' liens and other liens, such actions have repeatedly been regarded as equitable in nature so that no jury right attaches." *Id.* at 60. Although Rosenman's claim implicated legal issues like "the contractual liability giving rise to the lien," actions "to enforce a lien are inherently equitable," regardless of how the lien came about. *Id.* at 60–61. The same is true here.

To counter this authority, Infocon makes one essential point: Quantum meruit relief often rests on legal claims. True enough, if an attorney brings a breach of contract claim against a former client, the client may ask for a jury. *See Simler v. Conner*, 372 U.S. 221, 223 (1963). But actions to enforce *liens* remain equitable actions, even when the dispute that led to the lien implicates the meaning of the underlying contract. *Rosenman & Colin*, 850 F.2d at 61.

Infocon next argues that, even if the district court had authority over this quantum meruit claim, the court misjudged it by awarding more money to DeMoisey than he deserved. To arrive at its $1.4 million award, the district court started by assuming that DeMoisey and his associate worked at least a combined 3,500 hours on the Exact/Infocon suit. Applying an average rate of $220/hour, it started with a base fee of $750,000 (a little less than $220 times 3,500). It added $150,000 for the complexity of the litigation, $300,000 for the extent to which the case precluded DeMoisey from other work and $300,000 for the exceptional result DeMoisey reached, and docked DeMoisey $100,000 for his ethical lapses. We review these calculations for an abuse of discretion, keeping in mind the well-earned nature of this discretion given the district court's role in handling the underlying litigation. *See Kalyawongsa*, 105 F.3d at 289.

Infocon complains that the district court failed to account for DeMoisey's alleged violations of state rules of professional conduct—in truth, failed to account for them *in full*, as the court deducted $100,000 for just this reason. The court faulted DeMoisey for his "failure to confirm the existence of a signed fee agreement" and criticized how

DeMoisey handled Nijhawan's and Hughes' request to share in a $45,000 sanction award paid by Exact. R.397 at 25. But the court decided not to reduce DeMoisey's fee for his decision to start a business (Alocam) with his clients because this ethical lapse had no bearing on the fee dispute, a choice that did not exceed the court's discretion.

Infocon faults the court for taking a dim view of Peter Ostermiller (the lawyer Infocon hired to replace DeMoisey) and drawing improper "inferences" from Ostermiller's representation. Br. at 49. But the district court did no such thing. The court meaningfully referred to Ostermiller two times in calculating DeMoisey's fee. In analyzing the deteriorating professional relationship between DeMoisey and Infocon, the court noted that Ostermiller's failure to extend professional courtesies to DeMoisey likely contributed to the problems. And in asking whether DeMoisey delivered exceptional results, the court suggested that Infocon could have negotiated a higher settlement, but that Infocon's failure to do so was against DeMoisey's advice and may have stemmed from Ostermiller's intervention. We see nothing wrong with either consideration, and repeat that both are the kinds of things a judge with a ring-side view of the dispute is apt to understand far better than judges with a cold paper record to go by.

Infocon claims the court should not have found that DeMoisey and his associate worked 3,500 hours. Because the pair thought they had a contingency fee agreement, they did not carefully keep track of their time, and DeMoisey could point to only 1,947.25 hours in his reconstructed records. But DeMoisey testified that this estimate was conservative, and the court found his testimony credible. DeMoisey's expert testified along the same lines, suggesting that the estimate might be "understated by half." R.397 at 20. The court accordingly assumed that the duo spent between 3,500 and 4,000 hours on the case. That was reasonable on this record.

That leaves a few other claims. Infocon argues that DeMoisey did not deserve $300,000 for exceptional results. But when one considers, as the district court did, that DeMoisey helped turn "a relatively modest collection action" into "a multi-million dollar lawsuit, . . . result[ing] in a $4 million settlement" for Infocon, *id.* at 24, that argument

melts away. Infocon argues that the court should have reduced the award because other firms worked on the case and because Hughes helped with discovery. But neither point goes to what *DeMoisey's* work was worth and what the district court thought that work was worth. Infocon argues that the court should have granted it a credit for the expenses incurred in the state court proceedings. But DeMoisey's conduct in post-settlement state court litigation says nothing about the value of his pre-settlement services. Last of all, Infocon argues that, because the district court previously sanctioned Exact and ordered it to pay a portion of Infocon's discovery expenses ($45,000), it should have received a credit for the payment. But, as the district court explained, the $45,000 payment went to DeMoisey. Nothing in the record shows that DeMoisey double-billed for this time, obtaining $45,000 from Exact for this work and then seeking compensation from Infocon for the same time. No doubt DeMoisey's shabby billing records make it difficult to prove any such thing, but that is where the district court's discretion over this dispute becomes paramount. The issue was brought to the court's attention, and it reasonably concluded that the two fees were separate, one to be paid by Exact, the other to be paid by Infocon.

IV.

For these reasons, we affirm.