NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0594n.06

Nos. 14-5496/5501

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Aug 20, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KEITH GUY, SR., et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | (No. 14-5496) |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| LEXINGTON-FAYETTE URBAN COUNTY | ) | UNITED STATES DISTRICT |
| GOVERNMENT, et al., | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendants-Appellees. | ) | |
| | ) | |

| | | |
|---|---|---|
| MORRIS & MORRIS, P.S.C., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | (No. 14-5501) |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| GAYLE SLAUGHTER, et al., | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Plaintiffs-Appellees. | ) | |
| | ) | OPINION |
| | ) | |

Before: BOGGS, SUTTON, and McKEAGUE, Circuit Judges.

BOGGS, Circuit Judge. These two appeals, which we consider together, both ultimately derive from the sexual abuse of children by Ronald Berry, a sometime-employee of the Lexington-Fayette Urban County Government (LFUCG) and founder of a non-profit summer program that LFUCG funded in part. Some of those children sued LFUCG and its officers on a variety of theories. The plaintiffs' lawyers disputed fees, and some of the lawyers appeal the

district court's quashing of the attorney's lien they placed on certain settlement proceeds. On the merits, the district court denied a number of plaintiffs' motions and granted defendants' motions for summary judgment on a variety of plaintiffs' claims. The plaintiffs appeal these grants of summary judgment. We affirm each judgment of the district court for the reasons that follow.

I

Ronald Berry served as the executive director of Micro-City Government (MCG), "a nonprofit community service program providing activities for inner-city youth." *Berry v. Commonwealth*, 84 S.W.3d 82, 84 (Ky. Ct. App. 2001). Berry used his position in MCG to meet boys, whom he later raped.[1] He was convicted of twelve counts of sodomy in the third degree and was sentenced to three years of imprisonment on each count, with all sentences to run concurrently. *Ibid.* Following Berry's indictment, victims of Berry's abuse filed civil suits, including this one, which has led to several appeals. "Plaintiffs allege that Berry abused minors over the period of 1969 to 1996. LFUCG and various numbers of its officials have been the

---

[1] "In 1997 . . . two former MCG participants who alleged [that] they were abused by Berry made reports to LFUCG and the Lexington police. These reports led to Berry's arrest, prosecution, and conviction for sex crimes." Op. and Order (May 30, 2013), at 10. In March 1998, a state grand jury charged Berry

> with three counts of indecent or immoral practices and twelve counts of third-degree sodomy. The sodomy was alleged to have occurred between late 1977 and 1980. All five of the victims were participants in [MCG] and most were members of the Playboy Club, a social club of [MCG] which met weekly at Berry's home. All were either fourteen or fifteen years old when Berry committed various sexual acts with them, including oral sex and anal penetration. Berry was at all times over twenty-one years of age.

*Berry*, 84 S.W.3d at 85 (footnotes omitted). After two mistrials and a change of venue, a grand jury returned a third indictment against Berry, this one for third-degree sodomy against a sixth victim between 1982 and 1986. *Ibid.* In this case, as before,

> Berry met the victim through Micro-City Government and, like [he did on] the other five victims, Berry performed a variety of sexual acts on this victim, including oral sex and anal penetration. The first offense occurred when the victim was twelve years old. Over Berry's objection, the new indictment was consolidated with the previous indictment for trial. The third trial was conducted in March, 2000. The jury returned a verdict of guilty to all twelve counts of third-degree sodomy, and recommended concurrent sentences of three years' imprisonment for each count.

*Ibid.*

target of several class actions by" putative classes. *Guy v. Lexington-Fayette Urban Cnty. Gov't*, 488 F. App'x 9, 11 (6th Cir. 2012). As we recently explained:

> On October 15, 1998, four victims (Keith Guy Sr., Barry Demus Jr., Octavius Gillis, and Christopher Williams) . . . filed [a] putative class action . . . . The complaint named only LFUCG as a defendant. The named plaintiffs, with the exception of Guy, settled in 2000, prior to any ruling on class certification. Two additional victims, Craig Johnson and David Jones, then moved the court to provide notice of the dismissal to the putative class pursuant to Federal Rule of Civil Procedure 23(e). The district court denied that motion, reasoning that the lawsuit had brought so much publicity that anyone who was going to come forward to join the suit would have already done so. Within two years of the ruling, however, nearly 100 class members came forward. Guy, Johnson, and Jones appealed. Johnson and Jones settled, leaving Guy as the sole named plaintiff appealing the denial of Rule 23(e) notice.

*Guy*, 488 F. App'x at 11-12.

Additional civil suits were filed by plaintiffs alleging that Berry abused them. On March 3, 2000, attorney Gayle Slaughter entered an appearance in district court, on behalf of certain plaintiffs, with whom she had entered into a contingency-fee agreement. Later that year, Slaughter and her colleague William L. Huffman, "solicited the involvement of Lexington attorneys Sharon and James Morris," who constitute the law firm Morris & Morris ("M&M"; "Morrises"). Memo. Op. and Order (Jan. 29, 2014), at 2. The two pairs of lawyers—Slaughter and Huffman, and the Morrises—"never memorialized, or indeed ever reached, a meeting of the minds as to the financial terms of their collaboration. From 2000 forward, the Slaughter/Huffman group and the Morrises all worked on behalf of the proposed class in various capacities." *Id.* at 3. In an earlier opinion, we described the next steps in the litigation as follows:

> On May 3, 2000, a second class action was filed by Johnson, Jones, and seven John Does, naming LFUCG and ten

> former LFUCG officials as defendants. *Doe v. LFUCG,* No. 00–166–KSF (*Doe I*). Two years later, the named plaintiffs settled and *Doe I* was dismissed. Rule 23(e) notice was neither requested nor given to putative class members.
>
> . . . .
>
> On May 5, 2005, in a consolidated appeal . . . , the Sixth Circuit vacated the judgment in *Guy. Doe v. Lexington–Fayette Urban Cnty. Gov't,* 407 F.3d 755, 764 (6th Cir. 2005), *cert. denied,* 546 U.S. 1094 (2006). The court decided that the district court abused its discretion by refusing to provide Rule 23(e) notice to absent class members in *Guy* and *Doe I*.

*Guy*, 488 F. App'x at 12 (6th Cir. 2012) (footnotes omitted). "In the meantime," as the district court recently explained,

> tensions had developed between Slaughter/Huffman and the Morrises regarding their respective roles in the litigation. Letters detailing these tensions were exchanged during the summer of 2006, and numerous vituperative motions were filed containing accusations of misconduct on both sides. In particular, Slaughter contended that the Morrises had been dealing directly with her clients and attempting to "steal" them.
>
> On July 13, 2006, Slaughter sent a letter to the Morrises stating that she was "discharge[ing] your firm from service to us in your capacity as lead co-counsel" in the case. Slaughter further stated, "It is in the best interest of my and Larry's clients (the John and Jane Does 1-95) that you submit your final hourly bill to us for services rendered and costs to date, for payment in the event that we prevail and recover damages."
>
> On September 25, 2006, attorney Barbara Bonar, who by then had become associated as co-counsel with Slaughter and Huffman, wrote a letter to the Morrises. This letter came on the heels of apparent attempts by Bonar to mediate, informally, the dispute between Slaughter and the Morrises. In the letter, Bonar noted that Jim Morris had informed her that the Morrises were withdrawing from the case, and she stated: "Gayle Slaughter and Larry Huffman acknowledge that you performed significant legal services for the case (the 1011 hours you submitted) for which you should be compensated."
>
> On November 17, 2006, the [district c]ourt held a status conference to address this dispute, as well as other issues. As a result of discussions at the conference, the Court directed that each set of attorneys – the Morrises on one side and Slaughter/Huffman on the other – consult with the individual plaintiffs and ask them to

4

> choose which attorneys they wished to represent them, and that each side would execute retainer agreements with their clients.
>
> In its Order following the hearing, the Court directed that one set of plaintiffs would be denominated the "Does," represented by the Morrises, and that Slaughter and Huffman's clients would be called the "Roes."
>
> Thereafter, counsel tendered an Agreed Order, which the Court signed and entered on December 14, 2006, striking over two dozen motions and other filings relating to the above dispute.
>
> Subsequently, counsel filed two separate amended complaints on behalf of the plaintiffs they represented, and the case moved forward.

Memo Op. and Order (Jan. 29, 2014), at 4-6 (citations omitted). This apparent accord, despite the district court's orchestration, failed to resolve all of the disputes among plaintiffs' counsel. More than six years later, the Morrises placed an attorney's lien on any settlement payments to Roe plaintiffs.

On May 30, 2013, the district court granted summary judgment on all claims except for the § 1983 claims against LFUCG (not individual defendants) of two plaintiffs who alleged that Berry had abused them while LFUCG employed him directly to administer the summer lunch program. Subsequently, the summer-lunch-program plaintiffs settled. Their claims are now moot.

In light of this grant of summary judgment, plaintiffs argued to the district court that it should not have dismissed "plaintiffs for whom the record contains no evidence as to whether their alleged abuse occurred in connection with" the LFUCG-run summer lunch program." Order (Sept. 16, 2013), at 3. To remedy this error, the plaintiffs requested 60 days to amend the complaints of otherwise dismissed plaintiffs, to allege abuse in a way that would survive summary judgment, and to investigate further the factual bases of claims. In other words, the plaintiffs sought additional time to discover whether they had been abused by Berry while

LFUCG employed him directly, which fact, under the district court's previous order, would allow their claims to survive summary judgment.

The remaining plaintiffs also moved to amend the district court's summary judgment order on several other grounds, alleging that

(1) the district court's dismissal of all but two claims went beyond the scope of defendants' motions to dismiss;

(2) the public notice regarding the class was insufficient because it did not mention the summer lunch program; and

(3) the district court's dismissal of the claims for conspiracy to violate constitutional rights, *see* 42 U.S.C. § 1985, was error, because, when Berry was not a state actor, he could have conspired with the state.

The district court denied the motions. Certain Roe plaintiffs timely appealed the three orders granting summary judgment and denying Roe plaintiffs' motions to amend, for relief from, and to strike those and related orders. They are the *Guy* appellants here. The *Guy* appellees include LFUCG and fourteen individual defendants, all former LFUCG officials and employees.

Although certain Roe plaintiffs appealed the district court's grant of summary judgment, which appeal we consider below, many others settled following that grant. On November 21, 2013, the Roe plaintiffs moved to quash the attorney's lien that the Morrises had placed on the Roe settlements. The district court granted that motion. Morris & Morris timely appealed.[2]

---

[2] In docketing their appeal, the Morrises apparently joined Slaughter and Huffman's co-counsel, the law firm Arnold & Miller, PLC (A&M), as an appellee. *See* Appellee Br. 19 (observing that the Morrises "joined A&M as an Appellee in this matter, and we have been forced to defend this Appeal when there is absolutely no factual or legal support for the inclusion of A&M as an Appellee in this action"); *see, e.g.*, Civ. App. Statement (May 12, 2014) (naming Arnold & Miller PLC among counsel for the Roe plaintiffs). Slaughter and Huffman appear not to have filed any brief in this court separate from A&M's brief.

II

Given these facts, we turn first to the Morrises' appeal of the district court's decision to grant the motion by Slaughter and Huffman to quash the Morrises' attorney's lien.

A

As a preliminary matter, "[f]ederal courts must determine that they have jurisdiction before proceeding to the merits." *Lance v. Coffman*, 549 U.S. 437, 439 (2007).[3] We have jurisdiction to consider the Morrises' appeal. The Morrises appear to have a good-faith dispute with the appellees regarding attorney's fees in the underlying case. The underlying case arises under federal statutes and so the district court had subject-matter jurisdiction over it. The Morrises' filing of an attorney's lien in accordance with Kentucky procedure was appropriate under Kentucky state law and was "so related to claims in the action within . . . original jurisdiction that they form[ed] part of the same case." 28 U.S.C. § 1367(a); *see Exact Software N. Am., Inc. v. Demoisey*, 718 F.3d 535, 541-42 (6th Cir. 2013) (recognizing that where a district court has original jurisdiction over a civil action, 28 U.S.C. § 1367(a) provides broad supplemental jurisdiction over related claims that encompasses resolution of attorney's fees disputes integral to the litigation). The orders quashing the attorney's lien and denying the motion to reconsider became final judgments within the meaning of 28 U.S.C. § 1291 at the latest when the district court dismissed the Doe claims with prejudice and certified that there was no just reason for delaying an appeal. *See* Fed. R. Civ. P. 54(b); *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436 (1956). Thus, we have jurisdiction.

---

[3] A&M argues that we lack jurisdiction, apparently on the grounds that: (1) the Morrises' argument for jurisdiction fails, Appellee Br. 18 (discussing *Exact Software N. Am., Inc. v. Demoisey*, 718 F.3d 535 (6th Cir. 2013)); (2) we "ha[ve] no jurisdiction to resolve a claim for breach of an alleged oral contact [sic] between Kentucky citizens," Appellee Br. 19; and (3) we have no jurisdiction to hear the appeal of the district court's order denying an accounting, because the Morrises appealed before that order was entered, Appellee Br. 20; *but see* Reply Br. 1-2 (citing *Dixon v. Clem*, 492 F.3d 665 (6th Cir. 2007) and Fed. R. App. P. 4(A)(4) to rebut the third aforementioned ground).

B

The district court did not commit error by quashing the lien, as we explain next.

We review the district court's granting of the motion to quash for abuse of discretion. *Kalyawongsa v. Moffett*, 105 F.3d 283, 289 (6th Cir. 1997). As a preliminary matter, although no party alleges that M&M actually contracted with anyone prior to the 2006 order, the parties dispute whether Slaughter and Huffman involved M&M to work for them or to work directly for some (or all) of the plaintiffs. The matter is more than academic, because, given that M&M never had a contract for the work they performed prior to 2006, they can recover only on a theory of quantum meruit, and the Kentucky law of quantum meruit for attorneys depends on the relationship between the attorney and his or her client and on the circumstances of the termination of that relationship.

M&M argues, essentially without citation, that Slaughter and Huffman led M&M to believe that M&M was working directly for the underlying plaintiffs. This is not a colorable argument on the record presented. Slaughter and Huffman solicited M&M's involvement. When Slaughter and Huffman learned that M&M was soliciting plaintiffs directly, Slaughter and Huffman reacted extremely quickly and negatively. Although M&M *had* worked for underlying plaintiffs in the sense of engaging in litigation tactics designed to benefit and actually benefiting plaintiffs, they cannot demonstrate a formal attorney-client relationship, because Slaughter and Huffman assigned and supervised their work.[4]

We consider next whether M&M can recover on quantum meruit for their pre-2006 work performed for Slaughter and Huffman. "Quantum meruit is an equitable remedy invoked to

---

[4] The parties dispute the degree to which supervision occurred; M&M argues that had they not completed certain actions on behalf of the Roe plaintiffs, no one would have. Of course, that does not demonstrate that M&M were independent of Slaughter and Huffman; it could indicate, on the contrary, that Slaughter and Huffman delegated certain assignments to them.

compensate for an unjust act [such as] a benefit conferred without proper reimbursement. It, therefore, entitles the one who was harmed to be reimbursed the reasonable market value of the services or benefit conferred." *Lofton v. Fairmont Specialty Ins. Mngrs.*, 367 S.W.3d 593, 597 (Ky. 2012) (citing Black's Law Dictionary (9th ed. 2009)).

Although "for a lawyer to find support for a *quantum meruit* claim, the client must discharge the attorney unjustly," *ibid.*, a discharge is not unjust or without cause for quantum meruit purposes simply because the lawyer regards it as unjust. Even a cause "good" enough to justify withdrawing as counsel under Kentucky Supreme Court rules "does not translate into a comparable justification or 'good cause' to be entitled to *quantum meruit* compensation for past services. They are two entirely different standards, with a much lower threshold to withdraw . . . than to withdraw with *quantum meruit* compensation." *Id.* at 596 (citing Ky. Sup. Ct. R. 1.16(b)).[5] As a general matter, "[w]here an attorney withdraws without valid cause, he cannot collect any payment under a contingency fee agreement—even through an action for *quantum meruit*." *Adler v. Childers*, 2014 WL 5311133, at *3 (E.D. Ky. Oct. 16, 2014). But "when both parties contribute to the breakdown of the [attorney-client] relationship . . . Kentucky law indicates that an attorney may recover his fees under an action for *quantum meruit*." *Ibid.*

The Supreme Court of Kentucky recently considered the application of quantum meruit in *Bonar, P.S.C. v. Waite, Schneider, Bayless & Chesley Co., L.P.A.*, a case similar to this one. 373 S.W.3d 419 (Ky. 2012). In the case underlying *Bonar*, the plaintiff-appellant lawyer simultaneously filed a motion to withdraw and a notice of attorney lien under Ky. Rev. Stat. Ann. § 376.460. *Id.* at 422. The Kentucky Supreme Court held that "[w]hen an attorney

---

[5] *See also Lofton*, 367 S.W.3d at 597 (observing that "[i]n a contingency fee arrangement, a written contract is *required*" (emphasis added)) (citing Ky. Sup. Ct. R. 3.130-1.2(a)).

voluntarily withdraws from a contingency fee case without good cause, he or she forfeits any fee," even if he or she seeks to recover fees under a contract with former co-counsel. *Id.* at 423.[6]

The parties dispute whether any Roe plaintiffs were M&M's clients. To whatever extent plaintiffs were, the Morrises could make a colorable case that they withdrew, especially from work for Slaughter and Huffman, because of a breakdown in the intra-counsel relationship for which all parties, or at least both pairs of lawyers, were at fault. But the district court found that view unpersuasive compared with an alternative view: M&M withdrew *voluntarily*, even if under a court-brokered deal. That is, the very district judge who presided over the proceedings in 2006 when the attorneys' disputes came to a head, and were resolved pursuant to an *agreed* order, held that that order resolved the matter of M&M's entitlement to compensation for previously rendered services and precluded enforcement of the attorney's lien. The abuse-of-discretion standard requires us to uphold the district court's choice among multiple colorable views, and we see no reason to alter the district court's choice. The district court's finding that M&M withdrew voluntarily was not an abuse of discretion. We AFFIRM the judgment of the district court.

---

[6] As certain scholars have explained:

> [A]n attorney who voluntarily withdraws from a case without good cause forfeits recovery of compensation for services performed, and he or she may not recover either on the contract or on quantum meruit. [N]evertheless, . . . a lawyer who withdraws from a case without good cause or justification may receive compensation if the withdrawal results in no prejudice to the client; compensation for the good faith work of the withdrawing lawyer should be assessed in relation to the time and effort required by both lawyers towards completing the litigation process and assessed from the perspective of the result ultimately obtained compared with the intermediate accomplishments by the withdrawing counsel.

7A C.J.S. Attorney & Client § 430 (footnotes omitted). *But see ibid.* ("Upon an *abandonment* of their contract of employment by an attorney and a client, the attorney may recover the reasonable value of the services which he or she has rendered . . . ." (emphasis added) (footnotes omitted)).

III

We turn next to the appeal of the remaining *Guy* plaintiffs. At the heart of each claim is this argument: the same "knowledge of and complicity" in Berry's sexual abuse that gave rise to the district court's finding of possible deliberate indifference also constitute a governmental custom or policy "and therefore 'state action.'" Appellant Br. 10-11. This argument has no support in case law. Indifference is not always deliberate, deliberate indifference is not always a policy, and even a policy of indifference is not the same as state action. *Cf. Lownsberry v. Lees*, No. 06-13602, 2008 WL 4852791, at \*13 (E.D. Mich. Nov. 7, 2008) (granting summary judgment on § 1983 deliberate indifference claims against community agency for hiring and failing to supervise teacher at agency-run preschool who allegedly sexually assaulted plaintiff). So the district court did not err here, as we explain below.

A

On appeal, appellants specifically argue that:

(1) The district court abused its discretion by denying their request under Rule 60(b) for 60 additional days of (self-)discovery;

(2) the district court erred by failing to address whether certain plaintiffs' mental incompetence tolled the statute of limitations;

(3) the district court erred by granting summary judgment to defendants on plaintiffs'

(a) state-created-danger claims;

(b) claims against LFUCG for abuse committed by Berry in the course of his MCG responsibilities, partially funded by LFUCG; and

(c) conspiracy claims (i.e., under § 1985).

We consider each claim in turn.

B

1

We first address what appears to be the appellants' strongest claim. On May 30, 2013, the court granted summary judgment to all defendants on all claims except for those alleging abuse during Berry's leadership of the school lunch program. On October 24, 2013, plaintiffs filed a motion under Federal Rule of Civil Procedure 60(b)[7] requesting that the court grant the "plaintiffs sixty days to conduct limited discovery and submit to the court the identity of the Roes whose abuse occurred during the 'summer lunch' program as defined in the court's May 30, 2013, Opinion and Order." Roe Pls. Memo. in Support of Rule 60 Mot., at 3-4. The district court denied this motion. Plaintiffs now claim this was error.

---

[7] Plaintiffs discussed the motion here as being under Rule 60(b)(6) and we consider it as under that rule. LFUCG suggests that because the district-court order from which plaintiffs' sought relief did not dispose of all plaintiffs' claims, and Rule 60(b) concerns relief from *final* orders, the only Federal Rule of Civil Procedure under which the motion was appropriate is 54(b). *See* Appellee Br. 28 (citing *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949 (6th Cir. 2004)); *see also Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462 (4th Cir. 1991) (suggesting that the restrictions of 60(b) do not apply to a district court's treatment of a motion to reconsider a non-final order).

This argument likely hurts LFUCG as much as it helps. That is because the strictures of Rule 60(b) do not apply when district courts use their "inherent power to reconsider interlocutory orders . . . before entry of final judgment." *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991). *See* Fed. R. Civ. P. 60(b) advisory committee's note (1946); *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003); Wright & Miller, *Federal Practice and Procedure* § 2852 (3d ed. 2012). If Rule 60(b) does not apply here, that arguably makes it easier for the plaintiffs and *harder* for LFUCG to prevail on reconsideration. Yet the plaintiffs do not claim error on this front, and LFUCG ultimately prevails if Rule 60(b) applies. We thus see no harm in analyzing this claim under Rule 60(b) despite LFUCG's protests to the contrary.

But 60(b) has six subsections. Under which did plaintiffs move? The district court suggested that rule 60(b)(1) (providing for relief from judgment for excusable neglect) applied. Relief under 60(b)(1) is appropriate only if, among other criteria, the neglect is excusable. *See, e.g.*, *Yeschick v. Mineta*, 675 F.3d 622, 628 (6th Cir. 2012). The district court here determined that the plaintiffs failed to demonstrate that their neglect was excusable. So it denied the motion.

LFUCG suggests that motion might have been under 60(b)(2) (providing for relief from judgment for discovery of new evidence). Because any failure to discover the relevant evidence was due to the plaintiffs' own deployment of resources, rather than to external factors, relief under 60(b)(2) would be inappropriate. We treat the motion as being under Rule 60(b)(6), in accord with the plaintiffs' motion.

A movant for relief under Rule 60(b)(6) must demonstrate "exceptional and extraordinary circumstances, which are defined as those unusual and extreme situations where principles of equity mandate relief," *Exp.-Imp. Bank of U.S. v. Advanced Polymer Sciences, Inc.*, 604 F.3d 242, 247 (6th Cir. 2010) (quotation marks omitted), but "which are not addressed by the first five numbered clauses of" Rule 60(b). *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989) (citing *Pierce v. United Mine Workers,* 770 F.2d 449, 451 (6th Cir.), *cert. denied,* 474 U.S. 1104 (1986)).

We review the district court's denial of a motion under Rule 60(b)(6) for abuse of discretion. *See, e.g.*, *Browder v. Dir., Dep't of Corr.*, 434 U.S. 257, 263 n.7 (1978). We will hold that the trial court has abused its discretion only when we have "a definite and firm conviction that the trial court committed a clear error of judgment." *Blue Diamond Coal Co. v. Trustees of UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001). In ruling on a motion made under 60(b)(6), the trial court's discretion "is especially broad given the underlying equitable principles involved." *Hopper*, 867 F.2d at 294 (internal quotation marks omitted) (citing *Overbee v. Van Waters & Rogers,* 765 F.2d 578, 580 (6th Cir. 1985)).[8] To prevail before us, plaintiffs must demonstrate not only that their situation is unusual and extreme, but also that, in reaching a different conclusion, the district court abused the discretion that long-standing equitable practice, confirmed by the Federal Rules, granted it.

Plaintiffs here fail to carry this heavy burden. As the district court correctly observed, the appellants had "ample time" to research and submit to the court the evidence they sought additional time to discover. We note that neither discovery orders nor recalcitrant opposing

---

[8] All of Rule 60(b) is rooted in equitable practice; before the fusion of law and equity, litigants sought equitable relief when barred by technicalities from legal relief: "[t]he rule is designed to remove the uncertainties and historical limitations of ancient remedies while preserving all of the various kinds of relief that they afforded." *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989) (quoting 11 Wright & Miller, *Federal Practice and Procedure* § 2851, at 140 (1973)).

counsel prevented plaintiffs from discovering the information they sought: the source of the information that the appellants' counsel purports not to have been able to discover was *the appellants themselves*.

Appellants' account must proceed like this: the plaintiffs in the litigation, i.e., people who plausibly could allege that Berry abused them in such a way and at such a time as to render LFUCG and the individual defendants liable, were so numerous that counsel could not be sure that they had collected and presented to the court *all* instances of Berry's abuse of plaintiffs; on this account, the district court's order on May 30, 2013, granting summary judgment on all non-summer-lunch-program related claims indicated to plaintiffs for the first time that they ought to attend to whether Berry abused others among them during his tenure as head of LFUCG's summer lunch program.

Is this account believable? The law committed the answer to that question to the discretion of the trial court. The court here, long familiar with the underlying cases, apparently concluded that this account was incorrect. The court noted that plaintiffs had been alerted to the parameters of the "state action" issue and its relation to Berry's involvement with the summer lunch program since 2010. The court therefore concluded that plaintiffs' failure to support their claims factually on this point was not due to "excusable neglect." Nor was the court persuaded that plaintiffs had otherwise identified such extraordinary circumstances resulting in manifest injustice as would warrant relief under Rule 60(b)(6). This conclusion was not an abuse of its discretion. After all, although Berry's abuse of youth in Lexington was tragically long and vast, it was not infinite. Also finite was the number of plaintiffs. Even prior to May 30, 2013, plaintiffs' counsel could have and, at least in some cases, *did* solicit from plaintiffs allegations of

actual abuse during Berry's summer-lunch-program tenure. We decline to reverse the district court's judgment that the time for client interviews had gone on long enough.

2

The district court did not commit error by dismissing "the Roes . . . who are incompetent" and were abused during the summer lunch program (even if they had not yet alleged that they were abused *during that program*). Roe Pls. Memo. in Support of Rule 60 Mot., at 2.

As a general matter, the statute of limitations is tolled in Kentucky on account of mental incompetence. But the orders appealed here did not concern the statute of limitations; they disposed of plaintiffs' claims for other reasons. Equitable tolling was not material to these rulings. It follows that the district court committed no error by failing to address the mental-competence issue.

3

Finally, we review de novo the district court's grant of summary judgment to defendants on three sets of claims.

The first grant of summary judgment that we review was on the state-created-danger claims. The district court did not commit error in finding no "state-created" danger. As a general matter, the Constitution does not render the government liable for failing "to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). We have recognized "a[n] exception[:] when the State cause[s] or greatly increase[s] the risk of harm to its citizens . . . through its own affirmative acts, it has established a special danger and a duty to protect its citizens from that risk." *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (internal quotation

marks omitted) (quoting *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir. 1998)). The elements of such a state-created-danger claim are:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) [that] the state knew or should have known that its actions specifically endangered the plaintiff.

*Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). Here, plaintiffs-appellants cannot show an action, but rather only inaction. Even if plaintiffs had argued that LFUCG, after learning that Berry had sexually abused minors in his care, undertook an affirmative act when it rehired him to direct the summer lunch program in subsequent summers, it could not present any evidence to that end, because none of the remaining appellants has alleged abuse during Berry's directorship of the summer lunch program. And even if appellants could overcome that hurdle, they have not shown a danger that is sufficiently "special" as the doctrine means it—affecting a few potential victims, not a few hundred. We AFFIRM the judgment of the district court granting summary judgment to the defendants on the state-created-danger claims.

The second grant of summary judgment that we review was on the state-actor claims. The district court did not commit error when it dismissed all but one Roe Plaintiff by finding there was no constitutional violation because Ronald Berry was not a "state actor."

A party can be a state actor if it satisfies one of several tests. The test relevant here is the so-called "nexus test," under which a party is a state actor if there "is a sufficiently close nexus between the state and the challenged action . . . so that the latter may be fairly treated as that of the state itself." *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000) (citation and

internal quotation marks omitted). Such a nexus requires "intimat[e] involve[ment]" by the state in the challenged action. *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992).

The district court identified only two nexus factors: "MCG received most of its funding from LFUCG, and one LFUCG councilmember served for a time on the MCG Board, albeit not in an *ex officio* capacity." Op. and Order (May 30, 2013), at 16. The court concluded that "these two factors are wholly insufficient as a matter of law to satisfy the 'nexus' test." *Ibid.* For the reasons ably set forth in the district court's opinion, we find no error. Neither MCG nor Berry (in his MCG capacity) was a state actor under the nexus test. We AFFIRM the judgment of the district court dismissing the § 1983 claims of plaintiffs that depend on the argument that they were.[9]

The third and final grant of summary judgment that we review was on the conspiracy claims. The district court did not commit error in not finding a conspiracy.

To determine whether the state conspired with a private actor in the context of "allegations of concerted action between state and private actors that is not undertaken pursuant to any challenged state procedure," *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007) (defining civil-rights conspiracy and collecting cases), we have "set forth the general definition of a civil conspiracy: an agreement between two or more persons to injure another by unlawful action." *Ibid.* (citing *Am. Postal Workers Union, Local 96 v. City of Memphis*, 361 F.3d 989, 905 (6th Cir. 2004)). We have held that "plaintiffs ha[ve] successfully pled a § 1983 conspiracy by alleging that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed." *Revis*, 489 F.3d at 290 (citing *Local 96*, 361 F.3d at 905-06). Plaintiffs here allege that the defendants,

---

[9] As mentioned earlier, the district court has twice denied LFUCG's motion for summary judgment on the summer-lunch-program claims for municipal liability under § 1983.

at most, acquiesced in Berry's illegal activity. But mere acquiescence in private misconduct does not constitute facilitation or conspiracy. *Cf. Asmar v. Keilman*, 756 F. Supp. 332, 335 (E.D. Mich. 1991). The district court was correct to grant summary judgment to defendants on plaintiffs' conspiracy claims. We AFFIRM the judgment of the district court on those claims.

IV

In conclusion, we AFFIRM each judgment of the district court now before us.